Good morning. I'm going to reserve five minutes. My name is Alex Flangus. I'm here on behalf of Leviton Manufacturing Company. With me today is Richard Halstead, an attorney from my office, and Arthur Richenthal, who is sitting right over here so that he can hear, who is general counsel for Leviton, good friend of Harold Leviton, goes back a number of generations. Leviton is headquartered basically out of New York. They have a significant distribution facility in Reno, Nevada, and that's why we're here today. Unless the panel desires otherwise, there are three things that I really want to focus on today. Number one, the contractor failed to follow relevant contract provisions, and the district court didn't require the contractor to adhere to those provisions. Number two, certain breaches of contract that were found by the district court, and the district court found a number of breaches by the contractor, the court failed to award damages and simply said, not going to do it, even though the law says you need to. And the third thing I want to address is the Ninth Circuit's decision in MRO. What was that again? The third thing or the second? Third. Third is the Ninth Circuit made a decision in MRO versus AT&T. About which we can't do very much, so I would suggest, about which we cannot do very much as a three-judge panel. So I suggest that maybe you should, unless you have some way to distinguish it, that you not tell us why it's wrong, because it's not going to help. Well, the key to why it's wrong, why it shouldn't apply here is simply to do it first. I'm not trying to hijack the order of your argument. I'm just suggesting when you get to it, I would focus not on why it's wrong, why you believe it to be wrong. You'd rather me focus on? On anything else about it, but not why it's wrong because a three-judge panel can't overrule it. If you can distinguish it, fine. If you can't, we'd have to go en blanc to say it's wrong. I understand. And we may end up there. The problem and the concern that I've got with MRO is that it is, in the sense that it's distinguishable, it's not distinguishable in the sense that an offer was made under FRCP 68 and no other offer, but that the Court, frankly, doesn't seem to be applying the Nevada law. In the Kelly case, in the Nicholas case, both Nevada Federal cases seem to make distinctions, but the Ninth Circuit didn't. As a practical matter, the decision under Nevada law would not be appropriate. So we are sitting in a rather precarious position because somebody has to be able to challenge the fact that the Ninth Circuit appears to have made a mistake trying to apply state law. Our Supreme Court in Nevada will never address what a Federal court does. It just won't say, well, a Federal court shouldn't have done that because it won't have a repair before them. That's on the attorney fee issue, right? Yes, Your Honor. Are you going to argue that on the merits, the attorney's fees were not justified? I'm going to argue that as well, Your Honor, that the attorney's fees were not justified. But I am going to first argue, if I could, the points of the contract, because if this Court finds that the contract was violated, that in fact the district court was obligated to award damages to Levitin against the contractor, then the offer of damages would be unapplicable under existing law. The Kelley case, the Walsh v. Kelley case decided by Judge Reed in Nevada, says that if there are any award at all, then the Federal rule applies, it's cost-shifting only and not attorney's fees. So the first focus is why the district court is obligated to award damages to Levitin against the contractor.  Is that what you're claiming? That in essence, Your Honor, we're claiming that if the district court erred in awarding no damages against the contractor, then once any damage award is entered, nominal or otherwise, yes, if we get to that point, then MRO is clearly distinguishable and we don't need to argue for any kind of modification to that case, even though, frankly, it's pretty clear it should be modified. Let me go back to the first thing here. The first thing that the contractor did was the contractor accepted $9 million from Levitin to build a building. It went in there and said, we have expertise, we have experience, we are excellent contractors, we are not the low bidder, interestingly enough, and we will go in and build you a fine building. A fine warehouse has to have a flat floor. That's what this case was about. The trial court failed to appreciate and apply certain contract provisions. And the reason the trial court failed, the specific reason, was because this trial court came into the case predisposed to believe that nothing a contractor does has anything to do with design. On the third day of trial, third day of four weeks, he stated, and this is at excerpt of record, the trial transcript, page 388, you are attempting in this case to prove the contractor is bound by more than his contract. The way I started out this case was thinking that the decisional law of the State of Nevada was a case I lost in 1968 before the Nevada Supreme Court called Home Furniture versus Brunzel that stated that principle. The trial judge had represented an owner, just like me, against a contractor, just like me, and the Nevada Supreme Court said, you lose because the contractor did everything right. You should have sued the architect. In our case, this trial judge tried the case from day three on, predisposed to believe that if anything has to do with design, that falls in the architect and engineer's lap, not in the contractor. Kagan. He's either right or wrong. I mean, are you making a bias to process argument? No, I'm not biased. I'm saying that it's hard when you come in with that predisposition, that as you hear evidence of specific contract provisions that require the contractor to be involved in the mixed design. But look, the district court's holding said the Q and D was obligated to build strictly in accordance with the contract documents. Q and D was obligated to follow the contract documents drawings, specification in project manual section 003300, the specification set forth the parameters of the concrete mixed design required to be used on this project. And 3300 required, specified certain physical characteristics. I mean, he was holding him responsible for all of that. Well, interestingly enough, Your Honor, one of the things we pointed out that was a requirement under the contract was to supply an experienced installer. Experienced was defined in the specifications specifically at section 1.5 under quality assurance. Experienced installer must be used, and that means has completed concrete work similar in material, design, and extent to that indicated for this project and whose work has resulted in construction with a record of successful in-service performance. The second portion of the specifications that talk about experience are at section 1420, again, excerpt of record 572E, defines experienced as five such projects minimum. The contractor in this case, Q and D, hired Lucky Concrete to do the concrete work, subcontracting, and Lucky's testimony is undisputed. They only worked on two unreinforced slabs in their entire the entire time that this superintendent was there in 20 years. And of those two, one of them resulted in curling. Our problem, Your Honor, curling. That means at the end of this case, at best, Lucky had a 66 percent failure rate. Three times they'd done it, twice they had failed. The district court never addresses that in any of his findings at all, that the contractor was inexperienced and that's a specific contract requirement. It doesn't even address it. You have to link that up to the actual failures. And his overall point seemed to be that the district judges, that the failures that caused the principal problems here, although there are other more minor problems that he claimed didn't cause any, that he concluded to cause no damages, were due to the design and not to the workmanship. Exactly. And that's so the points you just made just have nothing to do with that, because even if this person didn't meet the specifications in the contract, if nothing was traceable to the workmanship, it didn't matter. Well, let's address that. The contractor was required under the specifications to actually choose the mix and supply the mix, choose the mix, not just the mix. I thought, I guess the question is, was he supposed to choose the mix according to anything other than the specifications in the contract documents for choosing the mix, of which there were some, right? The answer is. Some specifications in the contract documents. Yes. And the answer is yes, he was. Notably, the specifications in the contract are not sufficient to design the mix. There's not enough there. That's why, but he was also supposed to submit it to the engineer and presumably it was the engineer who was supposed to worry about the other things. Well, the engineer was supposed to review the mix, review the submittal, and the contract specifically talks about what the engineer's review responsibilities are under 3.12.10 of the contract, 3.12.10. The specific language of the contract says that it's a limited review. It is a review to approve or other appropriate actions, submittals only for the limited purpose of checking conformance with information given and design contract concept expressed in the contract. The point is that in the industry, recognized even by the experts for the contractor, recall in their expert witness report, they identified responsibility for poor mix on the designer, on the concrete supplier, on the concrete subcontractor. The industry recognizes that the concrete supplier and subcontractor are the ones who take minimal skeleton specifications. Knowing that this whole concept, there's no steel in this slab, this is an unreinforced slab, anybody looking at this would know. There's no steel, it's unreinforced. You're not contending that he should have, that the contractor had some obligation to say, you know, the absence of steel here is a very bad thing, there should be steel. Well, actually, yeah. We contended that as well, Your Honor. And the reason we contended that was an interest. And that was certainly a design decision, which was specifically made and which was not the contractor's business, no. Keep in mind, Your Honor, we are talking about a couple of things that are important in the overlap. One of them is the experienced installer also bears on the responsibility of the contractor to review the plan and specs for any perceived errors or omissions. The one piece of evidence that the district court did exclude was a memorandum, trial exhibit 185. Trial exhibit 185, unfortunately, in my brief, I think I misstated that it was at 456. I think it's 656 of the excerpt of record. But the trial exhibit is a memorandum from Q&D's project engineer. And the project engineer, after the problems arose, said, in my 30 years of experience, I've never seen a slab without steel. How could they think it wouldn't curl? Your Honor, the experience of the subcontractor should have been, I've only poured two unreinforced slabs in my entire career, and one of them failed for curling. Should I mention this to anybody or not? And we contend, yes, the law is very clear. You need to bring those things to somebody's attention. They don't have to specify the steel. The contract allows them to bring it up. And if steel needs to be added, we have to pay for it. But they need to bring it up. Well, you didn't sue the subcontractor, did you? The contractor sued the subcontractor. I know that, but you didn't. We don't have a contract with him, Your Honor. No, but that was the material supplier. We don't have a contract with the material supplier. The subcontractor had a contract with the material supplier. He went to the material supplier, and they went to an engineering firm to design the mix. They took that mix, and that was all contractor, subcontractor, material supplier, and material supplier's lab and designers. So your position is the subcontractor should have known this was a faulty design, should have told the contractor, contractor should have told the engineer who had approved the mix. Part of our argument is that. That this subcontractor didn't have the experience with unreinforced slabs. That's a different issue. Well, actually, it's the same issue in this sense, in this sense. You say he didn't have the experience. The other side is you're saying he did have the experience because he'd never seen a cement without enforcing, and he should have said something. Well, which side of the coin do you want? Actually, it's the same coin, Your Honor, and let me explain. Let me explain. He did not have good experience with unreinforced slabs. He did not have. He had bad experience with unreinforced slabs. He was an extremely experienced contractor who could say, I've done it for years, but your design won't work. You understand that what we're doing, basically, I know you're asserting that this was a breach of contract, but much of it has to do with the findings of the district court and his acceptance and believability and credibility of the evidence. I understand, Your Honor. Okay. Well, one of the things that this contract, I'm sorry. I was going to suggest that you address the fees issue because it's. The which? The fees issue because your time is running. Okay, I will address that very briefly. On the fees issue, the first issue is that if any damages are awarded, even for the breaches the district court found, and he found a number of breaches and simply said, I'm not going to award damages for them. He didn't explain why. He just basically said, well, if you didn't do your job right in doing joint filler, those joints would have failed anyway, and if they would have failed anyway, you're off the hook. There's nothing in the contract that says you're off the hook. If you don't put joint filler in, if you don't put, if you don't repair the bullet holes in the floor, he didn't find the 55,000 that we found, but he found 720, and yet he said, you don't get anything for those. And the contract doesn't say the depth of the hole means you don't have to fix it. The contract says you have to fix it. He didn't give us anything to fix it at all. If those damages are awarded, then the MRO case doesn't apply under Walsh v. Kelly, simply because as Judge. Walsh v. Kelly is a. Walsh v. Kelly is a federal court decision out of Judge Reed in Nevada, and what he did, he distinguished it and said, look, if there's an award to the plaintiff, then we have to compare the award with the damage. It doesn't make a lot of sense if MRO remains the law, right? I mean, there's not a very good reason for coming to a different conclusion with regard to a small plaintiff's verdict and no plaintiff's verdict as to whether there's a conflict with the federal statute. Under Erie, it would make a huge difference, Your Honor. Once there's a, there's a, the only reason that MRO stands. Is there anything you want to say about the application of the criteria for applying attorney's fees to this case? Yes. With regard to the judge's, and I'll just point this out. It's absolutely ludicrous that the judge could say that we brought the case in bad faith when the contractor's own expert identified the subcontractor as part of the problem. The contractor's own expert, our expert, the contractor's expert, the engineer's expert, everyone involved said the subcontractor did a bad job. The question isn't whether you brought the case in bad faith. The question is whether you rejected a $1.5 million offer of judgment in bad faith, isn't it? And, Your Honor, we addressed that. At the point that the offer of judgment was made, two things are important here. We were looking at $6 million worth of damages to Leviton. Well, that's very controversial, right? Because you're putting, you're putting a bunch of consequential damages in there. But, Your Honor, controversial doesn't mean that in good faith that's what's going to cost us to fix this, this, this floor. The second issue was. We couldn't recover it if it wasn't a basis for rejecting a settlement offer. Well, we certainly figured we could recover our own. Our own repair costs were significantly greater than their repair costs. Our own expert said that the repair costs were in excess of $2 to $2.5 million. To what? In excess of $2 to $2.5 million, not including. Most people, folks, you know, unless you thought you had a slam-dang winner, would, looking at $2.2 to $2.5 million in damages, would take a $1.5 million settlement. That's not the total damages, Your Honor. That's the repair contractors. In addition to that, the cost of moving the conveyor alone, which no one in court disputed the testimony that it is too low to do the work. No one disputed that. The cost of moving that, and no one disputed the cost, was $400,000. We're now closer to $3 million. The whole point, Your Honor, is that at the point the first offer was made, it was made at a time when the contractor had $800,000 in their pocket from the subcontractor, and they were offering us basically $400,000. That's what they were offering. When they came back and offered $1.5 million, the $1.5 million was after we had taken all of the experts' depositions in discovery, and their own experts had pointed at them. Their own experts' reports had said, our subcontractor made a mistake. Your Honor, it's hard for me to understand how the district court could possibly conclude the Beatty factors that it was the key. Because keep in mind, the district court didn't say the offer was turned down in bad faith. The district court found that the case was prosecuted in bad faith. That can't possibly be true. Well, you, it seems to me your strongest argument is what you said, that there was evidence that you've had that the contractor should have found the mistake. It's used, your client certainly had no liability. He was relying on the experts, and he ended up without getting full reimbursement. Well, and Your Honor, I think our point is that under this contract, the subcontractor who supplied and installed the concrete had significant responsibility for supplying the concrete. I understand. You made that argument. I just. That's where we go. Okay. Okay. Thank you very much, counsel. May it please the court, I'm Whitney Sellert, representing Q and D Construction Company. Your Honor, this case became nothing more than a shakedown of the contractor to. Are you splitting your argument, by the way, or not? I'm sorry? Are you splitting your argument or not? I have 20 minutes, correct? And I have a representative of the surety here. You're just arguing. I'm arguing. Surety is not arguing. I just want to know where we are. Okay. Go ahead. I'm going to, just to be clear, I'll try. Hopefully we'll be done in 10 minutes and leave her the time. But if the panel wants to ask me questions, I want to address those because I was the trial lawyer as well. Okay, go ahead. And a successful trial lawyer, apparently so. So far. So far, Your Honor. In my estimation, I disagree wholeheartedly with many of the characterizations made by counsel. I don't think that they are supported by the record or any fair reading of the record or any fair reading of Judge Hagan's findings and conclusions of law. I think this case ultimately became nothing more than a shakedown by the owner of its contractor trying to hold them responsible for damages that were caused entirely by the owner's own defective plans and specifications, which they created. You call it a shakedown. I don't like that term, and I'll tell you why. That owner was personally innocent. The owner didn't build it. The owner relied on experts. And obviously, there were some experts who get him in. And the only question that we have, as I see it, is whether the contractor should have been held as a matter of law. The contractor was released as a matter of fact. And then the second question is, assuming that they can't establish a right under law, the second question is whether you should get your attorney's fees. Yes, Your Honor, I understand that. And there's some intrinsic appeal to that when you're standing at 10,000 feet looking down at the case. But the reality of this case was slightly different. The owner worked hand-in-hand with its design team from the very beginning of this case to blame the contractor. And they levied one allegation after another at the contractor for causing the project to fail. I think they did so because they didn't demand the same insurance and performance bond guarantees from its design team that it did from the contractor. But you had the deep pocket. We were the deep pocket, and we were the deep pocket target. And every time we addressed one of their allegations of defect or breach and disproved it, they simply shifted their theory to another. Ultimately, after we've gone through a litany of maybe 30 of these kinds of things, they tried to shift the entire responsibility for design to us. I mean, as I understand Judge Hagen's reading of the contract, it was this, that if your client or rather your client's subcontractor, having done this kind of work for many years in Nevada, if he was morally certain in his own mind that this thing was going to crack because you can't build unreinforced concrete tip-up wall floors in Nevada, but didn't tell anybody, that would be fine. That's the bottom line, right? That's Leviton's argument that they- But is that not what Judge Hagen found? No. As to the meaning of the contract? If I understand you correctly, I don't think that's what he said at all. I think what he was saying is, well, certainly under the contract, if the subcontractor knew and spotted a design flaw and failed to bring it to the owner's attention, that could be a breach. But there was absolutely no evidence whatsoever. If he knew, he did have to bring it, but there's no evidence that he knew. That's exactly right. And they had two years and six weeks of trial time to prove that, and they absolutely failed. The bottom line is- That was a rather narrow question, and a factual one, really not a contract interpretation question. Correct, I mean, there's the- They wouldn't bring it to anybody's attention if they didn't know, so we just deal with a fact question. Right, and the truth of the matter was, Lucky Concrete, who was the subcontractor on the case, is the most experienced contractor in northern Nevada, has substantial experience with tilt-up distribution centers all over northern Nevada. There was no evidence introduced whatsoever during the trial that there is any kind of material difference, at least in terms of what a contractor does, between a concrete tilt-up building that has rebar mesh reinforcement through the floor and one that does not. The only difference between the two is that the contractor does not have to put the steel in during construction, but the manner, methods, and finishing the contract are precisely the same, and we followed those to industry standards unquestionably, and they were completely unable to prove otherwise. Let me ask this question, and maybe I misunderstood. When the contractor was claiming, or I should say, yeah, when the owner was claiming the cement was improper, it was an improper mix. Was there any contention that there should have been a different mix, which would have saved the floor from upheaval or lifting? You know, it's kind of a convoluted question, but the bottom answer is no. The concrete that was provided, the mix, the proposal, the submittal that the contractor was required to give to the engineer for his review, complied with the specifications that were set forth in the contract. I know, I know they did. Well, I don't know if they complied with it. Did they comply with the specifications? Is there testimony evidence to that effect? Yes. There was no proven difference between the submittal requirement, the specifications of section 3300, and the proposed mix design as submitted. The only reason, and Leviton uses, tries to impose some duty that we have to provide appropriate concrete that doesn't have characteristics that are inappropriate in one respect or another, assumes, I mean, that's obviously a relative term. Appropriate for what? Appropriate relative to the plans and specifications. The concrete we submitted complied in every respect, and it certainly performed in the field, specifically as advertised in the proposal that we gave to the engineer. And as I tried to point out in my brief, and as I think all the testimony from all of the experts during the case was, the engineer of record has to review that proposal, not just for compliance with the plans and specifications, but also for unstated design objectives and goals, like his aggregate interlock load transfer system, which was stated nowhere in the contract. And there was never any evidence presented that any contractor would have any idea what that design system would be, how it would function, what its tolerances would be, what factors would go into deciding whether the concrete would perform adequately under the load conditions. Now, let me take you off that for one minute. Sure. I understand the factual aspects of this case. Your subcontractor paid $800,000. I know that's immaterial, but at least it's a factor that goes into the fee issue. And it's been told us that when there was first settlement negotiations, the amount that you offered was $400,000, which was half what the sub paid. No, Your Honor. The first offer we made was $1.2 million, which was the entirety of the settlement that we had procured from our subcontractor, and an additional $400,000, which they rejected. And we made that offer, Your Honor, early on in the case, when they had first raised some of these issues that we had not had a chance to test through further discovery. After the settlement discussions broke down, we made that as a formal written offer of judgment. And then we went into the discovery and took the depositions of all the experts and precipient witnesses and utterly debunked those theories. In other words, you're saying you did not try to get a bonanza off this case? Absolutely not. In the end, even after all that, then you offered $1.5 million. That's right. So isn't that at least just proof of the judge's notion that the case was vile in bad faith? You obviously thought it was worth $1.5 million to you to get out of it. I think Your Honor should be very mindful of that. Even after you really understood the case? Even after, yeah, that's right. Because when you make an offer of judgment like that, there are many things, many considerations that go into it. And it's not just a concession of liability. I understand it's not a concession, but it's a risk. It's a risk assessment. And I'll tell you one other thing that factored into that, frankly. The owner of the company I represented, Norm DeAnda, is a working man who's very proud of his company and very, very conscious of the reputation of his company. And he knew he had an unsatisfied client. He didn't feel responsible for it. Nonetheless, he tried to make it right. I guess that's why I'm asking you this. We're now morphing into the fees issue, but doing that, do you understand the bad faith, and are you defending that? I don't think the case was filed in bad faith, but I think the theories of liability were certainly maintained in bad faith. I think trying to allege some of these contractor breaches as causing this floor system to fail were definitely in bad faith and proven to be so. I think alleging that the contractor somehow had a higher design obligation than the engineer of record was in bad faith and utterly disproven by the I think that was in bad faith. I think the district court found, ultimately, that Leviton maintained their action in bad faith and that they rejected those settlement offers in bad faith because the contractor legitimately did try to make reasonable settlement offers to save judicial time and resources, the expenses of the parties, and the potential risk that there might be some liability on some of these tangential issues. Am I right in assuming that when you have a contractor's bond, it's just a bond, and if the bond company has to pay the client, if the insured has to pay the bonding company back, is that right? That's correct, Your Honor. That was hanging over our heads the whole time. I know. Okay. Do you want me to address the fees issue at all? I think you have to a certain extent. I was more interested in whether it was bad faith in bringing the action and whether it was bad faith in not accepting the settlement. And then I think you better address the third argument, which is there were minor breaches of contract, nominal damages of $1, cut you out of attorney's fees under Arizona law. Under Nevada law, Your Honor, and Nevada law, I'm sorry. I disagree with counsel's proposition in that regard. First of all, I didn't think that was the proposition. I thought the proposition was that the minor attorney's fees bumped you back into the federal statute. I think if I understand the argument correctly, it is that if the case were remanded for a fine of nominal damages, then that is technically a judgment in favor of the plaintiff. Therefore, Federal Rule 68 applies, which therefore directly conflicts with the state statutes and therefore trumps it, and so we don't get the fees. The argument is wrong. The first thing. Let me take the premise first. Is there any case that requires, as opposed to permits, the grant of nominal damages under Nevada law? Not that I'm aware of. In fact, I'm aware of two cases where the Nevada Supreme Court declined to remand for a fine of nominal damages when it found a technical breach of contract. All right, so let's go to the next point then. How does this, supposing the word nominal damages, how would that interfere with, how would that play under MRO and under Nevada law? It doesn't make a difference. And the first thing I would point out is that the court would still, you could independently affirm the award of fees under the court's inherent power to impose costs and fees for bad faith litigation, vexatious litigation practices. You have a finding of bad faith in this case that I do not think is clear error. And there's a case- I don't know if it's bad faith on litigations, much as bad faith not accepting the settlement. Well, I think- I'd have a hard time saying that a owner whose billing has been damaged, and it's not his fault or not his company's fault, should be faulted for bringing a lawsuit, even if he picked some of the wrong people. Well, I guess I would tend to disagree because the owner is driving the litigation at that point. He knows who the responsible parties are, and he's intentionally choosing to ignore that, simply to concoct one theory after another to try and hold our feet to the fire for something we never did wrong. And there's a limit to both logic and the legal responsibility for that. I'm sorry. It seems to me that it was a very technical case, both legally and factually. And that- and not foreordained how it was going to come out. It seems to me, as Judge Bright is suggesting, that your stronger ground is whether the rejection of the offer wasn't bad faith. And I thought that's really the standard anyway. And I only point to the- I mean, that's certainly another finding of bad faith. And I was simply on the fees issue trying to point out that that award is itself independently affirmable on the court's inherent power to award such fees. Getting directly to the MRO issue, if there's a judgment, a nominal judgment in favor of Leviton, I don't think it changes anything. Federal Rule 68, first of all, MRO says that the Delta Airlines reasoning that defines how Federal Rule 68 applies doesn't apply in diversity cases. That right there, I think, is a very distinguishing feature. Secondly, when you start getting into the analysis of whether or not Federal Rule 68 conflicts with the state rules, I don't think it does. I think Federal Rule 68 simply says, one, it defines the procedure for making an offer in federal court. There is no other. Secondly, certainly it applies in the sense that if a judgment is obtained by the plaintiff less than the offer made by the defendant, the offering party is entitled to cost. But it does not speak to fees at all. So there is no direct conflict. There's nothing to prohibit the enforcement of a state substantive statute that awards fees for precisely that kind of thing. And I think when you go back to the Hannah v. Plumer analysis that says, look, you have to look to see if enforcement of the federal rule is going to do two things. Is it going to abridge the Rules Enabling Act by abridging a substantive right that would otherwise be available in state law? And is it going to encourage forum shopping? And under that analysis, in this case, I think it shows there is no direct conflict. You wouldn't need to apply Federal Rule 68. You can apply the state rules, still enforce. You can still apply the federal rule and the state rules, because they're not mutually exclusive. It's not like an ERISA analysis. It's the kind of preemption. It's not that kind of preemption. Maybe your colleague should be given a chance. Thank you very much. Good morning. I'm Jan Jensen on behalf of the Surety Fireman's Fund. And I just want to address just a couple of things that I think may have gotten lost in this very voluminous record. Justice Breyer's question is about this innocent. Thank you for the promotion. One of my colleagues often says there is no justice in the Ninth Circuit. This is not an unlearned, innocent owner who was totally relying upon Q&D and lucky construction. I'm sorry, lucky concrete. There's a specific finding, finding number 32, that the owner was advised by its own design team, including Pisanella, to have reinforced concrete in this floor. The owner was aware of it, knew of the suggestion, and rejected it. So when they put together their plans and specifications for Q&D, Q&D followed those. This was not something that was only within the knowledge of Q&D or lucky concrete. The owner knew of the recommendation and rejected it. That's true with regard to the steel. But with regard to the contract mix, that certainly seems more within the expertise of a concrete contractor. I think as Mr. Sommer indicated, what the mix that was provided to the engineer for review did meet the contract specifications. What was not stated is what the engineer's design was, what they had in their head. And I think it was borne out at trial that they weren't really sure how their design was going to work. So all the contractor can be asked to do is follow those plans and specifications. They did that, submitted it, got the stamp of the engineer approving that this will work for my design, and they followed through from there. There's no evidence that what was provided did not meet what was stated in the contract, and the contractor should not have to do that. I'm glad you cleared that up. I had some impression that there was some other mix that might have made the concrete harder or better for the purposes, but apparently not. At least there may have been a mix, but this met the contract specifications. Yes, Your Honor, it did. Larger aggregate, less shrinkage. I need these things to make my design work. Then I agree. Q&D would have to come up with another mix. But the mix they provided, the engineer says, this will work. It didn't. There weren't any other specs in the design. So what you're saying, it met the design. You're saying the engineer approved it, which he was entitled to do, and there was no other alternative mix that was proposed in the plans and specifications. No, Your Honor. Okay. They met the contract requirements. Jumping just a little bit to the concern that the Court has about this, the bad faith issue in awarding attorney's fees. The Beatty factors in Nevada, there are four factors, two of which Leviton challenges, and one is the bad faith aspect. There is no Nevada precedent that says each and every one of those factors must be proven. Those are factors that are to be considered. That must be the most important one, don't you think? I mean, it seems that it No, Your Honor. I apologize. You can have legitimate cases and an unreasonable settlement position. You can have a case brought in the utmost good faith. That's why we were stressing that the bad faith has to be with or at least with regard to the rejection of the offer, not necessarily the litigation of the lawsuit. But I think the Beatty factors are not prerequisites. These are things the Court can consider. So even if you have a case where the offer was unreasonable or the decision not to take it was unreasonable, if the motivation behind the lawsuit is in bad faith and only one of those Beatty factors is met, then again, the Court can award attorney's fees. Here we're looking at all of the factors taken into consideration. There is no indication that Judge Hagan did not review each and every one of those factors. And in his discretion, he decided that it was appropriate here to award the attorney's fees to both Q&D and the surety. I want to know what our standard of review is. Is it abuse of discretion on the attorney's fees, or is it an error of law? I think it's abuse of discretion. But the Court has to make determinations on the Beatty factors, right? He has to consider the Beatty factors and indicate in his order that those have been considered, and he did that. So the test is abuse of discretion? Yes, Your Honor. Okay. And I don't think there's any indication here that he abused his discretion. Very quickly, there's one issue raised in the Leviton brief. I don't know if you're concerned with it or not, is that's the consequential damages from the surety in excess of the contract. Excuse me? That was the surety claim, that if they win, they could get more money out of the surety than they can get out of the contractor. Correct. I understand that argument. Okay. Thank you very much, counsel. I'll give you some rebuttal time. The Beatty standard actually is in two pieces, and one is whether the claim was brought in good faith, well, three pieces, whether the defendant's offer of judgment was reasonable in good faith, and then whether the plaintiff's decision to reject the offer for a procedure trial was grossly unreasonable or in bad faith. So for the third factor, it doesn't have to be in bad faith. It just has to be grossly unreasonable. Well, grossly unreasonable and bad faith, I think, go together, Your Honor. I think the concept is that the bad faith suggests a bad motive as opposed to. Well, the interesting thing here is once the district court had his mind made up, that's where everything went. I understand. Candidly. I'm asking you why it wasn't grossly unreasonable to reject the $1.5 million offer. The $1.5 million offer, Your Honor, was made approximately a month and a half before trial, about maybe two months before trial. All of the discovery had been completed, and we were just headed into a court trial. All of the experts had continued to say exactly what I said earlier, which was that even the expert report presented by the defendant was that their own subcontractor was responsible for mix issues and didn't satisfy the mix issues. So here we are looking at that, saying, look, we know our damages are going to be in excess of what we're going to be awarded, so how could we, in bad faith, turn down an offer that we know is not going to get us there? In a matter of fact, didn't you get almost that same offer many months prior to discovery? Didn't you get a 1.2? Well, the interesting thing there, Your Honor, is that under Nevada law, it actually says, when you look at an offer, and Federal law says the same thing, when you evaluate an offer prior to discovery, you have to realize that you haven't even undertaken discovery yet. And when we undertook discovery and you evaluate it, you also look at how much are the attorneys' fees to go to trial in a complex action. I'm sure the attorneys' fees are, on the side of the defendant and the bonding company and whatever, are a lot. They will be a lot. And you're right, Your Honor. At the time that it was made, they were not as significant as they were after discovery. But at the same time, at the same time, we were being presented with our own experts' report, and then being told that in discussions, their experts were looking at it, and no one was coming back telling us that the contractor hadn't done something wrong. Everyone was saying the contractor's at fault. Your Honor, if I could, just to have perhaps a minute to wrap up on some of the substantive issues, because I think I've sort of got this. Thank you. The rationale that we're talking about here is mixed. It's mixed. And the question is, did this mix meet the specifications? If the recipe is ten things long and only four of them are specified, you have to pick  So the reality is the contract says submit it to the engineer, and the engineer is going to decide whether the other six work or not. Nothing in the contract exonerates the contractor for supplying a bad mix. In fact, specific contract provisions say that the architect's review of the united Do you disagree that the contract documents didn't give any criteria by which to measure those other, because the design requirements weren't specified? The criteria are in the contract. They are things like experience with an unreinforced slab, experienced installer, experience with the supplier, experience with the But that is making a contractor responsible for the design at that point. How is the thing going to stand up? But the problem, the problem, Your Honor, is that if you look at the contract, that's exactly what the contract says. It says that for one particular area, it says for those items where the architect specifies something, that the contractor is to go out and bring back the submittal with the stamp of approval, that the architect's not going to review it for any extensive analysis. It says that in 3.12.10. And what happened here was the district court had its mind made up that whenever this engineer looks at the mix, that exonerates the contractor. Can I ask you one question? Sure. Was it your position at the trial that it was the obligation of the contractor and the subcontractor to tell the owner and the engineer that this floor needed steel? They had two obligations. And it's the same obligation. It's the same. They had an obligation to notify the owner that they had bad experience with floors that had no steel. They had an obligation to tell them. It's a general knowledge everywhere. You know that in northern climates, this was rather unusual. But there was and there were engineers and architects who seemed to know what they were doing. The problem known to the contractor, Your Honor, the engineers are based out of Phoenix. The contractor is based out of Reno, Nevada, where it snows. The reality is we got different places, and the contract allows us to rely on the experience of the installer. In that 8th Judicial District case, in the 8th Judicial District case I cited from 1913, it says that the contractor, all this is true if the contractor has experts at his command by whom plans can be inspected and passed on or has large experience and presumed competency or holds himself out to have such. Well, one last question. Did the district court judge make a finding on that issue? On the issue of whether they had any responsibility? Yes. Your Honor, he made that finding on day three, and he continued it throughout the rest of the trial. Every time we talked about contract provisions related to mix, he said, You're trying to broaden the contractor's responsibility. I don't want to hear about it. And that's what the ultimate finding was. But it was premised from day three on. I'm looking at 3.12.10, and it says the owner and the architect shall be entitled to rely upon the adequacy, accuracy, and completeness of the services, et cetera, performed by such design professionals, provided the owner and architect have specified to the contractor all performance and design criteria that such services must satisfy. And the argument here is they didn't. They didn't specify to the contractor all performance and design criteria, so therefore, they couldn't rely on the his fulfilling them. I guess, Your Honor, there's also the problem, though, is that everybody knew that the contractor undertook that responsibility. The architect didn't go to the materials supplier. He didn't choose the mix from the supplier. He didn't go to the testing lab to specify what he needed. That's their problem. But you keep relying on this section, which seems to say the opposite of what you say it says. Well, actually, I really don't believe it does, because when you – again, when you look at the way this contract reads and the various provisions cited in the briefs, if you read them consistently through – and that's – realize this AIA contract is not brand new. These general conditions have been around for a while, and you have to read the whole contract. But when you do, it is quite clear that this contractor undertook to supply a mix that he couldn't possibly have done without choosing the elements. And if he'd have chosen a different mix, we probably wouldn't be here. Thank you very much. Thank you, counsel. The case of Levitan v. Fireman is submitted. We are in recess until tomorrow morning.
judges: Bright, D.W. Nelson, Berzon